No. 113,929

In the Matter of G. THOMAS WILLIAMS, *Respondent*.

(362 P.3d 816)

Opinion filed October 30, 2015.

*Deborah L. Hughes*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *G. Thomas Williams*, respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, G. Thomas Williams, of Overland Park, an attorney admitted to the practice of law in Kansas in 1982.

On September 25, 2014, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed a motion for additional time to file answer on October 16, 2014, which was granted by order dated October 20, 2014, and filed an answer on October 27, 2014. On January 7, 2015, the parties entered into written stipulations of facts. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on January 15, 2015, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.3 (2014 Kan. Ct. R. Annot. 475) (diligence); 1.4(a) (2014 Kan. Ct. R. Annot. 495) (communication); 8.4(c) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct involving misrepresentation); 8.4(d) (engaging in conduct prejudicial to the administration of justice); 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law); 8.1(a) (2014 Kan. Ct. R. Annot. 670) (false statement in connection with disciplinary matter); and Kansas Supreme Court Rule 207(b) (2014 Kan. Ct. R. Annot. 342) (failure to cooperate in disciplinary investigation).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

*"Findings of Fact*

. . . .

"9.   J.S. worked for the United States Postal Service for many years. She worked hard, saved her money, and was able to take early retirement at age 56. Commerce Brokerage Services, Inc., erred in reclassifying the funds from her thrift savings account, and J.S. suffered unexpected serious tax liability.

"10.   On March 29, 2012, J.S. met with the respondent. He agreed to represent her. On March 30, 2012, the respondent sent J.S. a contingency fee agreement. On April 4, 2012, J.S. signed and returned the agreement to the respondent.

"11.   From time to time, J.S. called the respondent's office to find out the status of the representation. Each time J.S. called, except once, the respondent was unavailable. J.S. left messages for the respondent. The one time J.S. was able to speak to the respondent, the respondent told J.S. that he had not heard back from Commerce Brokerage Services, Inc. The respondent promised to pull her file and get back with her. The respondent never communicated with J.S. again.

"12.   On August 1, 2013, J.S.'s husband, M.S., called the respondent's office. He identified himself only by his first name. The receptionist connected M.S.'s call to the respondent. The respondent told M.S. that he would be mailing out legal papers for J.S. to sign and return. J.S. never received any papers from the respondent.

"13.   Approximately 2 weeks later, J.S. called the respondent and left a message on his voicemail asking about the legal papers the respondent promised to send. The respondent failed to return the call.

"14.   On November 19, 2013, J.S. wrote to the respondent inquiring about the status of her case and asking to speak with him. The respondent received the letter but did not respond to it.

"15.   On December 30, 2013, J.S. filed a complaint against the respondent with the disciplinary administrator's office. On January 2, 2014, Ms. Hughes sent the respondent a copy of J.S.'s complaint to the respondent and directed that he provide a written response to the complaint within 20 days.

"16.   On January 30, 2014, the respondent provided a written response to J.S.'s complaint to the disciplinary administrator's office. The respondent's letter provided, in pertinent part, as follows:

'From the date of our meeting, I spoke with [J.S.] several times, and her husband once, letting her know I was still reviewing her file. Upon the completion of my review, I sent her the attached letter dated April 3, 2013, and never heard from her again. I closed my file and did not think anything of the matter, as my documents were copies and she possessed the originals, or a duplicate set of copies.'

The letter that the respondent purported to have written and sent to J.S. on April 3, 2013, provides as follows:

'I am writing to inform you that I am no longer interested in representing you in the above matter. My reasons are as follows:

1. The documents I have reviewed provide questionable liability, at best, against the defendant in this case, as they clearly state you are responsible for your tax advice.
2. I am very busy and do not care to continue with this case.

'This is not a statement that you have no case at law, in fact I do not pass judgment on that issue, just that I do not wish to represent you. If you wish to continue this matter, you should seek the counsel of another attorney, being mindful of your statute of limitations. You are hereby released from my fee agreement with no financial responsibility on your part. Should you wish copies or originals of your files, please contact my office.'

During the disciplinary investigation, the respondent told the attorney assigned to investigate J.S.'s complaint that he had mailed the April 3, 2013, letter. This statement was false.

"17.    J.S. did not receive the April 3, 2013, letter, because despite the respondent's statements to the investigating attorney and in his letter to the disciplinary administrator, the respondent did not send the April 3, 2013, letter. Rather, the respondent fabricated the letter for purposes of the disciplinary investigation. [Footnote: The disciplinary administrator determined that the name of the respondent's law firm, as of April 3, 2013, was different than what appeared on the letterhead of the April 3, 2013, letter. In fact, the firm name that appeared on the letterhead of that letter did not exist on April 3, 2013; it came into existence several months thereafter, evincing that the letter was created well after April 3, 2013.]

"18.    During the disciplinary investigation, the respondent provided a copy of the file he maintained in connection with his representation of J.S. In the materials provided to the disciplinary administrator was a copy of a handwritten note which purported to reflect a telephone conversation between the respondent and Steven Mathews, an employee in the compliance department of Commerce Brokerage Services, Inc. The respondent's note was dated April 3, 2013, and included the following statements:

'TC Steven Mathews Commerce
     No mention of tax
     said "I want all the $"
     ignored tax advice
     told her to get tax counsel/advice'

"19.    On March 19, 2014, Ms. Hughes wrote to the respondent, directed the respondent to submit to a statement under oath, and directed the respondent to provide certain items. Specifically, Ms. Hughes directed the respondent bring:

     . . . .

'2. Electronic copies of any and all documents you or a member of your support staff created in [J.S.'s] matter, including the letter dated April 3, 2013, that you provided to this office in response to [J.S.'s] complaint.

    a. These documents are to be produced in their native format, *i.e.*, the format in which they are stored and used in the normal course of business *with the metadata showing the electronic history of each document, including the dates the document was created, modified, and/or printed intact and accessible.* This request includes all electronically stored documents, whether stored in current, back-up, or archived computer files.'

. . . .

"20.   On April 8, 2014, Ms. Hughes and Terry Morgan, special investigator with the disciplinary administrator's office traveled to the respondent's office to take the respondent's sworn statement and the respondent's administrative assistant's sworn statement. During the respondent's sworn statement, the respondent testified that he could not locate the April 3, 2013, letter in an electronic form. Thereafter, the respondent offered false testimony regarding how the letter was created, as follows:

Q.   (BY MS. HUGHES) Showing you now what's been marked as Exhibit No. 2 and ask you if you can identify that?

'A.   It's a letter dated April 3, 2013, from me to [J.S.], Lansing, Kansas.

'Q.   And, again, the initials at the bottom are what?

'A.   The same as the other, GTW colon SW.

'Q.   Does that mean that Shirley Whitney typed that letter?

'A.   That's what it indicates.

'Q.   Is it possible you typed the letter and put her initials on it?

'A.   I don't believe so.

'Q.   And was this letter created on or about April 3 of 2013?

'A.   Again, documents are created sometimes the day before—you know, they might be done on a Friday, mailed Monday inadvertently, and that kind of thing, or done after hours. It's within a day or two. It's within one day postage-wise. And I believe the program updates the date if you reprint the letter, so it's within a day or two of April 3rd.

    . . . .

'MR. MORGAN: The date the letter was typed would be the date on this letter, is that correct, April 3rd?

'THE WITNESS: My understanding is that the program automatically— that she's set up the program to automatically produce the date that the letter is printed.

'MR. MORGAN: Thank you.

'THE WITNESS: But there's—that's my understanding.

'Q.   (BY MS. HUGHES) Do you recall the circumstances surrounding this letter? What caused you to create this letter for [J.S.]?

'A. Well, I think it speaks for itself.

'Q. You were terminating any representation. Is that a fair assessment?

'A. That's the intent—the overall intent.

. . . .

'Q. Did you produce an electronic copy of this document on the disc Ms. Whitney provided us?

'A. She said she couldn't find it.

'Q. And I'll represent to you that I loaded the disc, pulled it up and that letter is not on there.

'A. I understand.

'Q. Is that consistent with your understanding from her?

'A. She said it wasn't on the computer. She didn't—she did a search and couldn't find it. It wasn't misfiled, to her knowledge. She just couldn't find that letter—

'Q. Okay.

'A. —is what she told me.

. . . .

'Q. (BY MS. HUGHES) Did you check your computer in case you had typed this letter to see if you had saved—

'A. I wouldn't type it on my—you know, my computer.

'Q. You're confident you did not type this letter?

'A. Correct.'

"21. On September 25, 2014, Ms. Hughes filed a formal complaint in the instant case. In the formal complaint, Ms. Hughes alleged that the respondent fabricated the April 3, 2013, letter and the respondent fabricated the notes which purported to represent a telephone conversation he had with Mr. Matthews. On October 27, 2014, the respondent filed an answer to the formal complaint. In his answer, the respondent admitted to fabricating the letter and note for purposes of the disciplinary investigation. Thereafter, on January 7, 2015, the disciplinary administrator and the respondent entered into a written stipulation. In the written stipulation, the respondent again admitted to fabricating the letter and notes.

"22. Despite his answer and the written stipulation, during the hearing on the formal complaint, the respondent did not admit that he fabricated the April 3, 2013, letter, and note after receiving the disciplinary complaint. Rather, regarding the letter, the respondent testified as follows:

'Q. Mr. Williams, is it your testimony here today that the April 3, 2013, letter was already drafted and existed in your file when the disciplinary complaint came in, the letter to [J.S.]?

'A. The way that it worked was this, that—my assistant's name is Shirley. Okay. That I had drafted a letter that was in the file in draft form.

'Q. What do you mean "draft form"?

'A. Well, our office uses—and they're old school, I don't know why they do this—they have a printed letterhead. Okay. Everybody else in the 20th Century or 21st Century now that I know of uses a letterhead that's generated by a word processor. And I drafted a disengagement letter and apparently it never got sent.

'Q. But it was actually typed?

'A. Correct.

'Q. And existed?

'A. Right.

'Q. But it hasn't been sent?

'A. I don't think it was, no.

. . . .

'Q. In the electronically stored documents you provided for [J.S.'s] file that was not in there, was it?

'A. I don't believe so.

'Q. But it had been—it's your testimony that it had been created, though, and it should have been saved; is that a fair statement?

'A. You have to understand that—that not everything gets saved that's ever produced in the system. And, yes, of course, it should have been saved. And, yes, of course, it should have been there. But it had happened in my office before that letters had been sent and generated and no saved copy existed. In other words, they're on the system, but they were never saved in the file, in the computer file that was called [J.S.] file. And so I had seen that before and, no, the letter never got saved.

'Q. This is the first time you've shared this story that the letter had existed— had already been drafted and existed in the file with our office, the Disciplinary Administrator's Office; is that a fair statement?

'A. I don't know what's been stated by Mr. Ambrosio. I thought he'd offered that statement before. I think the point of my response was—

'Q. Let me ask it—I want the answer to my question. You had not told—you, I'm not asking what Mr. Ambrosio told us. You had not told the Disciplinary Administrator's Office this that the file—that that letter existed in your file, it had been drafted, but just had never been sent, you have never told that to this office, other than what I'm hearing here today?

'A. I don't believe so, no.

'Q. And it wasn't in your answer that you filed in response to the complaint?

'A. No. I wasn't completely forthright.'

And, regarding the note, the respondent testified, as follows:

'Q. I'd ask you to look at Exhibit 13, the document at page—Bates stamp page 110. You've talked about the April 3, 2013, letter and the circumstances surrounding that, but you have not addressed this note. What is this document that's Page 110?

'A. It's a photocopy of a handwritten note in my file.

'Q. And this was also not—this was fabricated, you didn't have a conversation with Mr. Williams—with Mr. Steve Matthews at Commerce on April 3, 2013?

'A. No. I spoke to somebody else. I spoke to somebody in their compliance department. This is a cryptic note to myself and I should have removed it from the file that's my mistake. I think if I had an attorney who would have bothered to look at it, he would have told me to do that.

'Q. To remove this from your file?

'A. It's misleading. It's a cryptic note to myself. I don't keep complete notes. When I was in a law firm where I had to interact with other attorneys I kept better notes. But now I sometimes will write TC on a note pad where I don't actually speak to a person or whatever. This was a misstatement and a misrepresentation to you because that's not what happened. I didn't speak to him. I spoke to somebody in Commerce compliance department. When I was downtown we represented Commerce Bank and I know they have a compliance department and I spoke to somebody there. So this note was not an accurate representation of what occurred in terms of that phone call.

'Q. This note purports to document what somebody said. I'm looking at the second note. It says, said, quote, I want all the—and then it's a money symbol, I think, dollar symbol, closed quote. Do you see that on there?

'A. Correct.

'Q. And that appears to me to be somebody telling you what [J.S.] said?

'A. No, it's what [J.S.] told me.

'Q. Said I want all the money?

'A. Yeah.

'Q. Ignored tax advice, what's that mean—

'A. That—

'Q. —on there?

'A. That—it's a note that means that she has a tax obligation and—independent of Commerce Bank and that—that Commerce—she did not engage Commerce Bank for the purpose of rendering tax advice, she had a CPA that offered her tax advice. And that was a note I made to myself regarding some of the substance issues of the file.

'Q. So these four notes under TC, Steven Matthews, Commerce, are not documentation of a conversation with Steven Matthews at Commerce?

'A. Correct.

'Q. They're not documentation of a conversation with anybody?

'A. No. They're notes to myself. Again, it's cryptic and taken in context they're—and I should have either offered an explanation for those or not submitted it, but you asked me for the full file, I believe.

'Q. You didn't submit this to our office in an effort to mislead us into believing that you had actually spoken to Steven Matthews at Commerce Bank?

'A. No. My misrepresentation was regarding the letter, it wasn't about this note. And I apologize for that. That was never my intent to tell you that I spoke—but that was my—I wrote that down because that's who I intended to call and I ended up talking to somebody in compliance and saying my name is Tom Williams, I want to ask about investment and the process that your investment people go through. I spoke to somebody else and I didn't write down who it was. I don't know who it was. It was just somebody in the compliance department.'

"23. The respondent provided five statements regarding the April 3, 2013, letter—(1) the statement in his initial response, (2) the testimony provided during the sworn statement, (3) the respondent's answer, (4) the written stipulation entered by the parties, and (5) the testimony provided during the hearing on the formal complaint. The respondent's statements regarding the April 3, 2013, letter are inconsistent. After weighing all the evidence presented by both parties, the hearing panel concludes that the respondent's admissions in his answer to the formal complaint and the written stipulation are consistent with the other evidence presented to the hearing panel; while the respondent's initial response and sworn testimony are not consistent with the other evidence. Thus, the hearing panel concludes that the respondent's statements in his initial response as well as in his testimony both during the sworn statement and the hearing on the formal were self-serving and false.

"24. Additionally, the respondent provided three statements regarding the April 3, 2013, note that purport to reflect a telephone conversation between the respondent and Mr. Mathews: the respondent's answer, the written stipulation, and the respondent's testimony during the hearing on the formal complaint. Again, the hearing panel finds the respondent's statements to be inconsistent. And, again, the hearing panel concludes that the respondent's admissions made in his answer and the statements in the written stipulation are consistent with the other evidence presented regarding the April 3, 2013, note. As such, the hearing panel concludes that the respondent's testimony before the hearing panel was false.

### "Conclusions of Law

"25. Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.3, KRPC 1.4, KRPC 8.1, KRPC 8.4(c), KRPC 8.4(d), KRPC 8.4(g), and Kan. Sup. Ct. R. 207, as detailed below.

### "KRPC 1.3

"26. Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The respondent failed to diligently and promptly represent J.S. when he failed to take any action on her behalf to accomplish the purpose for which he was retained. Because the respondent failed to act with reasonable diligence and promptness in representing his client, the hearing panel concludes that the respondent violated KRPC 1.3.

## "KRPC 1.4

"27.   KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, the respondent violated KRPC 1.4(a) when he failed to return J.S.'s telephone calls and when he failed to respond to J.S.'s email messages. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4(a).

## "KRPC 8.4(c)

"28.   'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty when he fabricated the April 3, 2013, letter, when he fabricated the April 3, 2013, note, when he testified falsely during the sworn statement, when he provided false information to the disciplinary investigator, and when he testified falsely at the hearing on the formal complaint. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

## "KRPC 8.4(d)

"29.   'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when he failed to take action to represent J.S. Additionally, the respondent engaged in conduct that is prejudicial to the administration of justice when he fabricated a letter, fabricated notes, provided false information to the disciplinary investigator, and when he testified falsely under oath both at the sworn statement as well as at the hearing on the formal complaint. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

## "KRPC 8.4(g)

"30.   'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The respondent engaged in conduct that adversely reflects on his fitness to practice law when he obstructed the disciplinary investigation by fabricating evidence, providing false information to the disciplinary investigator, and testifying falsely under oath during the sworn statement and the hearing on the formal complaint. The hearing panel concludes that the respondent violated KRPC 8.4(g).

## "KRPC 8.1 and Kan. Sup. Ct. R. 207(b)

"31.   Lawyers must cooperate in disciplinary investigations. KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b) provide the requirements in this regard.

'An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawyer demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.'

### KRPC 8.1.

'It shall be the duty of each member of the bar of this state to aid the Supreme Court, the Disciplinary Board, and the Disciplinary Administrator in investigations concerning complaints of misconduct, and to communicate to the Disciplinary Administrator any information he or she may have affecting such matters.'

Kan. Sup. Ct. R. 207(b). The respondent fabricated the April 3, 2013, letter after receiving the disciplinary complaint. Further, the respondent fabricated the April 3, 2013, notes which purport to reflect a telephone conversation between the respondent and Mr. Mathews. The respondent falsely told the attorney appointed to investigate the complaint that he had mailed the April 3, 2013, letter to J.S. Finally, the respondent provided false testimony during the sworn statement and during the hearing on the formal complaint. As a result, the hearing panel concludes that the respondent violated KRPC 8.1(a) and Kan. Sup. Ct. R. 207, by providing fabricated documents, by making a false statement to the attorney investigator, and by testifying falsely.

### "American Bar Association
### Standards for Imposing Lawyer Sanctions

"32. In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"33. *Duty Violated.* The respondent violated his duty to his client to provide diligent representation and adequate communication. The respondent violated his duty to his client, the public, and the legal profession to maintain his personal integrity.

"34. *Mental State.* The respondent knowingly and intentionally violated his duties.

"35. *Injury.* As a result of the respondent's misconduct, the respondent caused actual injury to the legal profession and potential injury to his client.

### "Aggravating and Mitigating Factors

"36. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its rec-

ommendation for discipline, the hearing panel, in this case, found the following aggravating factor present:

"37.   *Prior Disciplinary Offenses*. The respondent has been previously disciplined on two prior occasions. In 2004, the respondent entered into the attorney diversion program for violating KRPC 1.4. The respondent successfully completed the diversion. Additionally, in 2010, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.3 and KRPC 1.4.

"38.   *Dishonest or Selfish Motive*. The respondent's misconduct was motivated by dishonesty and selfishness. The respondent fabricated evidence, made a false statement to the disciplinary investigator, and falsely testified under oath. The respondent's dishonest conduct in this case is a significant aggravating factor.

"39.   *A Pattern of Misconduct*. The respondent has engaged in a pattern of misconduct. Twice the respondent created evidence to make it appear as though he properly represented J.S. Further, twice, the respondent falsely testified under oath. Finally, the respondent's prior discipline involved two of the same rules at issue in this case. Thus, the hearing panel concludes that the respondent engaged in a pattern of misconduct.

"40.   *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.3, KRPC 1.4, KRPC 8.1, KRPC 8.4(c), KRPC 8.4(d), KRPC 8.4(g), and Kan. Sup. Ct. R. 207(b). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"41.   *Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process*. As discussed above, the hearing panel concludes that the respondent made a false statement to the attorney assigned to investigate the complaint filed by J.S. and the respondent testified falsely during the sworn statement taken during the course of the disciplinary investigation. Also, the hearing panel concluded that the respondent testified falsely during the hearing on the formal complaint. The hearing panel is deeply troubled by the respondent's submission of false evidence and the false statements.

"42.   *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1982. At the time of the misconduct, the respondent had been practicing law for more than 30 years.

"43.   Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"44.   *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. In December, 2014, the respondent underwent a psychological evaluation. The psychologist concluded that the respondent does not have a 'diagnosable mental illness' and has an 'underlying normal personality' as the 'test indices do not indicate the presence of antisocial behavior, hostility, anxiety, thought disorder, agitation, paranoia, or impulsivity.' However, the psychologist also concluded that the respondent has 'likely

for some time (perhaps a few years) suffered depression, frustration, over-extension, discontent, and anger, without the insight to assess or the ability to express these feelings.' The psychologist also identified certain personality traits that are problematic. The hearing panel concludes that the respondent's personal or emotional problems mitigate his conduct as it related to the diligence and communication issues. However, the hearing panel finds no connection between the respondent's personal or emotional problems and the dishonest conduct.

"45. *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The respondent is an active and productive member of the bar of Overland Park, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"46. *Remorse.* At the hearing on this matter, the respondent expressed remorse. However, the hearing panel concludes that this factor is not a significant mitigating factor as the respondent appears to be remorseful that he is presently in this situation. The respondent does not appear to be remorseful for failing to properly represent J.S. or for engaging in dishonest conduct in the disciplinary investigation. The respondent's lack of genuine remorse was captured by his psychologist as follows:

'Mr. Williams has been open and cooperative with the evaluation, though he has made it clear he feels his offenses, for which he fully accepts responsibility, are minor and insignificant compared to those for which most other attorneys receive severe discipline. He becomes indignant when he considers he might suffer a significant disciplinary, practice-limiting sanction while other attorneys who have actually committed harmful, egregious acts have been merely reprimanded. Additionally, Mr. Williams's interview description of what transpired to bring on the current complaint was an abbreviated, glossed-over version of what appears in the Kansas Board's formal complaint.'

The hearing panel concludes that while the respondent presented some evidence of remorse, it is not a significant mitigating factor.

"47. *Remoteness of Prior Offenses.* The discipline imposed in 2004 is remote in time, but not in character, to the misconduct in this case.

"48. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.41 Disbarment is generally appropriate when:

. . . .

(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

'4.42 Suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

'5.11 Disbarment is generally appropriate when:

. . . .

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

'6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

'7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.'

*"Recommendation*

"49. The disciplinary administrator recommended that the respondent be disbarred. The respondent recommended that he be censured by the Kansas Supreme Court and that the censure be published in the Kansas Reports.

"50. The respondent engaged in repeated dishonest conduct. The hearing panel recognizes that the ABA Standards support a recommendation of disbarment. However, based on all the evidence presented to it, the hearing panel concludes that something less than disbarment is the appropriate discipline to recommend in this case. Thus, the hearing panel unanimously recommends that the respondent be indefinitely suspended from the practice of law. In the event the respondent applies for reinstatement, he should be required to establish that he clearly understands the serious nature of his misconduct and unconditionally and unequivocally accepts responsibility for engaging in a pattern of dishonest conduct.

"51. Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2014 Kan. Ct. R. Annot. 363). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the

truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing panel's final hearing report. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c) and (d) (2014 Kan. Ct. R. Annot. 383).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 1.3 (2014 Kan. Ct. R. Annot. 475) (diligence); 1.4(a) (2014 Kan. Ct. R. Annot. 495) (communication); 8.4(c) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct involving misrepresentation); 8.4(d) (engaging in conduct prejudicial to the administration of justice); 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law); 8.1(a) (2014 Kan. Ct. R. Annot. 670) (false statement in connection with disciplinary matter); and Kansas Supreme Court Rule 207(b) (2014 Kan. Ct. R. Annot. 342) (failure to cooperate in disciplinary investigation), and it supports the panel's conclusions of law. We adopt the panel's conclusions.

At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator recommended that respondent be disbarred. The respondent recommended published censure. The Hearing Panel recommended that the respondent be suspended indefinitely.

This court is not bound by the recommendations of the Disciplinary Administrator or the hearing panel. *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). The court bases each disciplinary sanction on the specific facts and circumstances of the violations and aggravating and mitigating circumstances presented in the case. *Mintz*, 298 Kan. at 912. This court has taken the position that, while prior cases may have some bearing on the sanctions that the court elects to impose, those prior cases must give way to consideration of the unique circumstances that each individual case presents. *In re Busch*, 287 Kan. 80, 86-87, 194 P.3d 112 (2008). This court concerns itself less with the sanctions that were appropriate

in other cases and more with which discipline is appropriate under the facts of the case before us. *In re Dennis*, 286 Kan. at 738.

We adopt the recommendation of the Disciplinary Administrator. The respondent validated our conclusion by continuing to suggest before this court that his behavior was something less than criminal and that this characterization somehow minimizes the severity of his actions. As pointed out at oral argument, he admitted the conduct of twice lying under oath, which actually is a crime punishable by imprisonment.

The pattern of misconduct, including the dishonesty, fraud, deceit, and misrepresentation outlined in the hearing panel's report coupled with the respondent's continuing denial of the gravity of his conduct leads us to conclude that disbarment is the appropriate discipline in this matter.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that G. Thomas Williams be and is hereby disciplined by disbarment in accordance with Supreme Court Rule 203(a)(1) (2014 Kan. Ct. R. Annot. 306).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2014 Kan. Ct. R. Annot 414) and Supreme Court Rule 219 (2014 Kan. Ct. R. Annot. 415).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.