IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,589

In the Matter of KEVIN W. KENNEY,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed July 16, 2021. Disbarment.

*Krystal L. Vokins*, Deputy Disciplinary Administrator, argued the cause, and *Matthew J. Vogelsberg*, Deputy Disciplinary Administrator, was on the formal complaint for the petitioner.

*John J. Ambrosio*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Topeka, argued the cause, and *Kevin W. Kenney*, respondent, argued the cause pro se.

PER CURIAM: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Kevin W. Kenney, of Prairie Village, an attorney admitted to the practice of law in Kansas in 1996.

On June 18, 2020, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent timely filed an answer to the complaint on June 29, 2020. The Disciplinary Administrator and respondent entered into a joint stipulation agreement on August 3, 2020, where the respondent admitted to the facts and stipulated that his conduct violated KRPC 3.1 (2021 Kan. S. Ct. R. 384), 3.3 (2021 Kan. S. Ct. R. 385), and 8.4 (2021 Kan. S. Ct. R. 427). Respondent personally appeared and was represented by counsel at the complaint hearing before a panel of the Kansas Board for Discipline of Attorneys, which was conducted on August 13, 2020.

1

At the conclusion of the hearing, the panel determined that respondent had violated KRPC 3.1 (meritorious claims and contentions); 3.3(a)(1) (making a false statement of fact or law to a tribunal); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice). The panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report, the relevant portions of which are set forth below.

"*Findings of Fact*

. . . .

"11.     The respondent is an attorney at law, Kansas attorney registration number 17448. His last registration address with the clerk of the appellate courts of Kansas is 7301 Mission Road, Suite 243, Prairie Village, Kansas 66208. The Missouri Supreme Court admitted the respondent to the practice of law in the State of Missouri on September 29, 1995. The respondent's license to practice law in Missouri is in good standing. The Kansas Supreme Court admitted the respondent to the practice of law in the State of Kansas on May 15, 1996. The respondent's license to practice law in Kansas is in good standing. The respondent has been actively engaged in the practice of law since admission.

"*Adoption of C.L.*

"12.     On September 13, 2016, C.L. was born in Topeka, Kansas. While in the hospital, C.L.'s biological mother put C.L. up for adoption through Kansas Children's Service League (hereinafter 'KCSL'). On September 15, 2016, the biological mother signed relinquishment papers.

2

"13.    That same day, KCSL placed the infant with a couple living in the Kansas City area who hoped to adopt C.L. The adoptive couple retained the respondent to assist them with adopting C.L.

"14.    On the evening of September 15, 2016, Melinda Kline, a KCSL social work supervisor, contacted C.L.'s biological father by phone and told him about C.L.'s birth and that he was believed to be the father.

"15.    Ms. Kline told the biological father that C.L. was placed with prospective adoptive parents and explained she was asking him to relinquish his parental rights. The biological father asked Ms. Kline who the baby's mother was. Ms. Kline refused to answer over the phone, preferring instead to meet with the biological father to sign relinquishment papers. The biological father asked if he would be able to meet with the prospective adoptive parents or see the baby. Ms. Kline's written log indicated that she responded, 'this is usually dependent on trust with the adoptive family.'

"16.    The next day, Friday, September 16, 2016, Ms. Kline again spoke to the biological father by phone. The biological father's mother joined the conversation. They told Ms. Kline that the biological father had an attorney, they provided the attorney's contact information, and they asked for a paternity test. The biological father's mother said if the baby was the biological father's baby, they wanted to receive custody of the baby.

"17.    The following Monday, September 19, 2016, the respondent filed a petition for adoption on behalf of the couple in Wyandotte County District Court. The petition sought to terminate the biological father's parental rights.

"18.    The petition alleged that the biological father's parental rights should be terminated because:

a.    The identified biological father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the biological mother during the six months prior to the Child's birth;

3

b. The identified biological father abandoned the biological mother after having knowledge of the pregnancy;

c. The identified biological father has made no reasonable efforts to support or communicate with the Child after having knowledge of the birth of the Child;

d. The identified biological father abandoned or neglected the Child after having knowledge of the Child's birth;

e. The identified biological father is unfit; and

f. Termination of the parental rights of the identified biological father is in the best interests of the Child.

"19. The alleged grounds for terminating the biological father's parental rights were made without prior factual investigation. Furthermore, the termination allegations were substantively false when filed because the biological father only learned of the biological mother's pregnancy after C.L.'s birth and only four days before the respondent filed the petition seeking to terminate the biological father's parental rights.

"20. The respondent had his clients sign a verification, affirming under oath that the allegations contained in the petition were true. The respondent also signed the petition.

"21. On September 20, 2016, without knowing that a petition for adoption had been filed in Wyandotte County, the biological father filed a paternity action in Shawnee County, Kansas, stating that he was 'willing and able to meet the financial and emotional needs of the minor child' and was 'a fit and proper person to be awarded the care, custody, and control of the minor child.'

"22. On October 5, 2016, the biological mother filed a motion to stay the Shawnee County paternity action until the Wyandotte County adoption proceeding was concluded.

4

"23.     On October 25, 2016, the Wyandotte County district court ordered a hearing on the adoption petition and scheduling the hearing for November 29, 2016. On November 4, 2016, counsel for the biological father entered his appearance in the adoption proceeding. For unknown reasons, the biological father was not served with notice of the hearing until November 26, 2016, less than three days before the hearing on the adoption petition.

"24.     At the November 29, 2016, hearing, the biological father appeared in person and by counsel. The biological father objected to the adoption. The district court ordered the biological father to arrange and pay for genetic testing. It also granted the prospective adoptive parents' request that the biological father and his attorney have no access to the documents in the district court's case file other than a redacted copy of the petition for adoption.

"25.     On December 6, 2016, the Shawnee County district court stayed the paternity action because the Wyandotte County district court achieved jurisdiction first and had already ordered paternity testing.

"26.     Subsequent DNA testing established the biological father's paternity of C.L.

"27.     While the adoption case was pending, the biological father was prevented from learning the identity of the prospective adoptive parents or where they were residing with C.L.

"28.     The matter proceeded to an evidentiary hearing on March 24, 2017. The biological mother testified at the hearing that she learned she was pregnant the morning she gave birth and that she never told anyone, including the biological father, that she was pregnant before that day. She also stated that she did not inform the biological father of C.L.'s birth.

5

"29.     On April 26, 2017, the district court terminated the biological father's parental rights, reasoning that the biological father, while the adoption case was pending, did not attempt to support or communicate with C.L. or ask about the child's welfare. Accordingly, the district court concluded that two statutory grounds for terminating the biological father's parental rights were established: (1) the biological father abandoned or neglected C.L. after having knowledge of the birth and (2) the biological father had made no reasonable efforts to support or communicate with C.L. after having knowledge of his birth.

"30.     The biological father appealed the district court's termination of parental rights to the Court of Appeals. In an unpublished opinion, on February 23, 2018, the Court of Appeals affirmed the termination of the biological father's parental rights, concluding that evidence supported the district court's conclusion that the biological father failed to make reasonable efforts to support or communicate with C.L. while the case was pending. The panel concluded, however, that there was insufficient evidence to support the district court's other basis for terminating parental rights.

"31.     Judge Tom Malone filed a concurring opinion, stating:

'What troubles me most about the case are the allegations against [the biological father] included in the adoption petition. The adoption petition, prepared by legal counsel, alleged the existence of almost every legal basis for termination of parental rights set forth in K.S.A. 2016 Supp. 59-2136(h)(1)(A)-(G). However, the petition alleged no specific facts supporting any of the allegations. The petition alleged, in the language of the statute, that [the biological father], after having knowledge of the pregnancy, failed to provide support to the mother and abandoned the mother while she was pregnant, even though these allegations obviously were untrue. The petition also alleged, in the language of the statute, that [the biological father] had made no reasonable efforts to support or communicate with the child and that he had abandoned or neglected the child after having knowledge of the child's birth. But at the time the petition was filed, there was no evidence to support these allegations because the petition was filed only four days after [the biological father] had been informed of C.L.'s birth. In fact, the only information available to the parties when the

6

adoption petition was filed was that [the biological father] had communicated his desire to assume his parental responsibilities and raise the child. Basically, the petition alleged almost every legal ground for termination of parental rights set forth in the statute, without any evidence at the time to support the allegations, in the hope that something would stick by the time the case was heard in court.

'At the evidentiary hearing on March 24, 2017, [the biological mother] testified that during her relationship with [the biological father], he had problems with drugs, alcohol, and depression. [The biological father] testified and denied any problems with drugs or alcohol, and he stated that his mental health issues were behind him. The district court made no findings as to those allegations, and in fact, the district court did not make any findings that termination of [the biological father's] parental rights was in C.L.'s best interest. Instead, the district court terminated [the biological father's] parental rights based on its findings that he abandoned or neglected C.L. after he was made aware of the child's birth and that he made no reasonable efforts to support or communicate with C.L. after having knowledge of the child's birth. The evidence to support these findings developed after the adoption petition was filed and while the case was pending in district court, but none of the evidence actually existed or was known when the petition was filed. Had [the biological father] insisted on receiving a hearing immediately after the adoption petition was filed, it appears there would have been little or no evidence to support the termination of his parental rights.

. . . .

'In light of the preference recognized in the law favoring a biological parent's right to raise his or her child, assuming the parent is fit, it seems to me like this case went off track from the moment C.L. was born. Only three days later, [the biological father] expressed his desire to assume his parental responsibilities. At that point, instead of rushing to the courthouse to file an adoption petition, all parties involved in the case should have at least temporarily put the adoption plans on hold. In the meantime, KCSL or some other appropriate agency could have conducted an investigation of [the biological father's] home and background to see if he would have been a suitable placement

7

option for C.L. Assuming that [the biological father] passed the initial investigation and background check, C.L. could have been temporarily placed with [the biological father] for a trial period to be monitored by the appropriate agency or the courts. Then, if any evidence developed that [the biological father] was not properly caring for C.L., a petition for termination of parental rights could have been filed with the court. Giving [the biological father] more of a chance to prove his fitness as a father would have been a better approach than rushing into an adoption proceeding and finding out later if there was any evidence to support it.' [*In re Adoption of C.L.*, No. 117,723, 2018 WL 1022887, at *7-8 (Kan. App. 2018) (unpublished opinion) (Malone, J., concurring).]

"32.    The biological father petitioned the Supreme Court for review. The Supreme Court granted review on June 19, 2018. At oral arguments on September 12, 2018, the respondent was questioned by the Supreme Court about the allegations contained in the adoption petition:

'JUSTICE JOHNSON: And let's look at that. The petition alleged grounds for termination, that the identified biological father, after having knowledge of the pregnancy, failed, without reasonable cause, to provide support for the biological mother during the six months prior to the child's birth. Is that true?

'MR. KENNEY: That was alleged, yes.

'JUSTICE JOHNSON: How could that be when he didn't find out until after the child was—was born?

'MR. KENNEY: Your Honor, it's a reasonable question. 'Um, you know, I was informed by the birth mother that she didn't know that she was pregnant until she had arrived at the hospital.

'JUSTICE JOHNSON: She didn't know she was pregnant until she went to the hospital and had the baby?

'MR. KENNEY: Correct.

8

'JUSTICE JOHNSON: But you're alleging that the putative father had knowledge for six months before the mother knew?

'MR. KENNEY: Let me explain. Your Honor, I've been doing adoptions for a long time and birth mothers have been untruthful to me in the past. And I don't know why she would have said she didn't know she was pregnant until she showed up at the hospital, but out of an abundance of caution we alleged that specific statutory ground just in case.

'JUSTICE JOHNSON: And what are your facts for the second allegation, that the biological father abandoned the mother—biological mother after having knowledge of the pregnancy? What's your facts that would support that allegation?

'MR. KENNEY: Again, Your Honor, birth mother[s] have lied to me in the past. We alleged all prebirth grounds, as it were, out of an abundance of caution.

'JUSTICE BILES: I guess I don't understand the abundance of caution, particularly since this is a verified petition. You have to have a factual basis to make a claim in a petition, regardless of whether it's an adoption case, or any case. Right?

'MR. KENNEY: Yes, Your Honor.

'JUSTICE BILES: And so, you're saying that your factual basis for making this allegation was that you thought it was possible that the birth mother was lying to you and so you claimed facts that you didn't know whether they were true or not?

'MR. KENNEY: That's essentially correct, Your Honor, but—

'JUSTICE BILES: Then let me go one step further, the adoptive parents, these people that want to have this child, are verifying, under oath, that there are facts to support something that nobody knows is true. How does that happen?

9

'MR. KENNEY: Your Honor, as I explained, we alleged that—

'JUSTICE BILES: I know what you did, I'm trying to figure out how it happens. It's not enough to just say this is a statutory allegation and I'm going to throw it into a petition and put my name on it, as a licensed lawyer, or to have my clients verify that that is true without a factual basis, is it?

'MR. KENNEY: That's correct, Your Honor.'

"33.    The Supreme Court issued its opinion on October 5, 2018, reversing the termination of the biological father's parental rights and remanding the case with directions that custody of C.L. be given to the biological father.

"34.    The Supreme Court stated:

'The record is also undisputed that by the next day—a Friday—Father was acting to protect his parental rights. He advised Kline he wanted custody, had retained a lawyer to accomplish this, and gave Kline his lawyer's contact information. Notably, instead of prompting a cooperative opportunity to work with that attorney to explore Father's potential relationship with his child, this news apparently triggered a one-sided, 'first strike' race to the courthouse to initiate adoption proceedings in another county that would preempt any lawsuit by Father to establish paternity and support obligations.

'The tactical move by the prospective adoptive parents had the desired result, but they admittedly got there by filing a lawsuit without appropriate factual investigation and by alleging false grounds for terminating Father's parental rights. They claimed, for example, that Father had failed to support Mother during the six months prior to C.L.'s birth and abandoned her after having knowledge of the pregnancy, even though he did not learn of the pregnancy and birth until two days after the fact. Worse yet, the prospective adoptive parents, under oath, verified these false accusations as being true. As Judge Malone

10

observed in his concurrence, "these allegations obviously were untrue" given the fact that no one—not even Mother—was aware of the pregnancy. [Citation omitted.]' [*In re Adoption of C.L.*, 308 Kan. 1268, 1283, 427 P.3d 951 (2018).]

"35.    On October 12, 2018, the respondent sent a letter to the disciplinary administrator, regarding his conduct in *In re Adoption of C.L.* In the letter, the respondent stated:

'An adoption case of mine was reversed by the Supreme Court on Friday, October 5th. The opinion is *In the Matter of C.L.*

'Although it was not the basis for the reversal, the Court was unhappy that the adoption petition included an allegation that the birth father had failed to support the birth mother during the last six months of her pregnancy, when birth mother claimed she didn't know she was pregnant until she delivered. I explained at oral argument that I am accustomed to birth mothers lying and I included the allegation out of an abundance of caution. Because the opinion mentioned this issue, my explanation does not appear to have appeased the Justice who inquired at oral argument.

'While I do not believe I violated the rules, I am concerned that the Justice might file an ethics complaint against me. Consequently, I have chosen to be proactive and bring this matter to your attention.

'Coincidentally, I learned for the first time Monday that the birth mother appears to have known she was pregnant before she delivered. The information was provided to me by the girlfriend/fiancée of birth mother's father.'

"36.    On October 16, 2018, the disciplinary administrator sent the respondent a letter, notifying him that the matter was being docketed as DA13,205 and referred to the Johnson County Ethics Committee for investigation.

11

"37.	On October 22, 2018, the disciplinary administrator received a letter from Douglas T. Shima, Clerk of the Appellate Courts, stating that he had been asked by the Supreme Court to transmit a copy of the court's *In re Adoption of C.L.* opinion 'for investigation and consideration of possible violation of the Kansas Rules of Professional Conduct by counsel.'

"38.	On October 24, 2018, the disciplinary administrator sent the respondent a copy of Mr. Shima's letter and asked him to verify in 20 days that he had received the letter and to include any information he believed was necessary to respond to the letter.

"39.	On November 12, 2018, the respondent sent a letter in response, stating:

'As I understand it, the issue as framed by the opinion of the Kansas Supreme Court . . . is whether alleging "the father had failed to support [the biological mother] during the six months prior to C.L.'s birth and abandoned her after having knowledge of the pregnancy" constituted "false grounds for terminating [the biological father]'s parental rights." [Citation omitted.] [the biological father] allegedly did not learn of [the biological mother]'s pregnancy until after C.L. was born. [Citation omitted.]

'At oral argument, I attempted to respond to the Supreme Court's concerns regarding inclusion of the pre-birth grounds described above. As I explained to the Court, it has been my experience in my almost 24 years of handling adoptions that birth mothers lie about a variety of issues. Thus, I felt it most prudent to include the pre-birth termination grounds in the event that C.L.'s mother had lied.

'I also relied on the following legal analysis. First, adoption is a creature of statute, *In the Matter of the Adoption of L.M.*, 48 Kan. App. 2d 343, 344-345 (Kan. App. 2012), and the grounds for termination of parental rights under the Kansas Adoption and Relinquishment Act are set forth at K.S.A. 59-2136(h)(1). Kansas adoption statutes are strictly construed in favor of preservation of parental rights. *In re Adoption of B.M.W.* 268 Kan. 871, 882 (Kan. 2000). Finally, Kansas is a notice pleading state, which requires a "short and plain statement of a

12

claim that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Kinsley v. Frydman*, 221 Kan. 297, 301-02 (Kan. 1977). Thus, it seemed fairest to place a young, unwed father on immediate notice of all possible grounds available under K.S.A. 59-2136(h)(1) for termination of his parental rights.'

"40.     In his response and at the hearing on the formal complaint, the respondent indicated that generally biological mothers often lie and that he was skeptical about the biological mother's claim that she was unaware she was pregnant until giving birth to C.L. and that his skepticism was 'warranted.' The respondent stated:

'After having read about the Supreme Court's decision in a Topeka newspaper, [the girlfriend of the biological mother's father] sent me the enclosed email . . . [and] it appears that the birth mother may have known she was pregnant before she delivered the child.'

The information the respondent received after the Supreme Court opinion was released was never investigated nor cross-examined. Because the information was not investigated, it is difficult to say whether the information was true or false. The receipt of this information does not make the false statements in the adoption petition true, nor does it mitigate the respondent's misconduct. At the time the respondent filed the adoption petition, he had no factual basis for the assertions made in the petition.

*"Adoption of Baby Boy F*

"41.     In May, 2016, the biological mother and the biological father of Baby Boy F, began dating. The biological father moved into the biological mother's residence and shortly thereafter, the couple learned that the biological mother was pregnant.

"42.     The biological mother and the biological father's relationship deteriorated by November, 2016, and the biological father moved out of the shared residence. A few days later, he returned to the residence to find that the biological mother had moved.

13

"43.     On January 21, 2017, the biological mother gave birth to Baby Boy F. The next day, the biological mother signed documents relinquishing her parental rights and agreeing to have Catholic Charities of Northeast Kansas place Baby Boy F with adoptive parents.

"44.     In the documents, the biological mother identified the biological father as the Baby Boy F's father, stated that he had accompanied her to one doctor's appointment and one sonogram appointment while she was pregnant, and asserted that he had not provided her with any financial support during the pregnancy.

"45.     Catholic Charities placed Baby Boy F with a prospective adoptive couple. The adoptive couple retained the respondent to assist them with adopting Baby Boy F.

"46.     Two days after Baby Boy F's birth, on January 23, 2017, the respondent filed a petition on behalf of the adoptive couple in Wyandotte County district court to terminate the biological father's parental rights and approve the adoption of the child.

"47.     Among other allegations, the petition alleged that the biological father 'made no reasonable efforts to support or communicate with the child after having knowledge of the birth of the child' and had 'abandoned or neglected the child after having knowledge of the child's birth.'

"48.     At the time the adoption petition was filed, the biological father did not know that Baby Boy F had been born. He learned of the birth of Baby Boy F when he was served with the adoption petition a few days later.

"49.     An initial hearing was scheduled for February 28, 2017. Prior to the hearing, the biological father asked the respondent if he could see his child. The record does not establish what he was told, but he was not given any visits. At the initial hearing, the respondent informed the district court that he had spoken to the biological father and that the biological father indicated to him that he wanted to assume parental responsibilities of Baby Boy F.

14

"50.     At the hearing, the biological father agreed to submit to genetic testing to determine paternity. Genetic testing later confirmed the biological father's paternity of Baby Boy F.

"51.     The respondent requested at the hearing that all information about the adoptive couple be sealed and not available to the biological father. The district court granted the request.

"52.     After the initial hearing, the biological father retained counsel to represent him.

"53.     On November 10, 2017, the district court conducted an evidentiary hearing in the adoption case. Following the hearing, the district court terminated the biological father's parental rights on the basis that, while the case was pending, the biological father failed to make reasonable efforts to support or communicate with the child after having knowledge of the child's birth. At that same time, the district court approved the adoptive couple's adoption of Baby Boy F. The biological father appealed the termination of his parental rights to the Court of Appeals.

"54.     On December 7, 2018, the Court of Appeals issued its opinion, concluding that the evidence presented at the hearing was insufficient to support the conclusion that the biological father had failed to make reasonable efforts to support or communicate with Baby Boy F after having knowledge of his birth. Accordingly, the Court of Appeals reversed the termination of the biological father's parental rights and remanded the case with directions that custody of Baby Boy F be given to the biological father.

"55.     Notably, in support of its decision, the Court of Appeals cited the Supreme Court's decision in *In re Adoption of C.L.*

"56.     While the disciplinary action regarding the respondent in the C.L. case was pending, the disciplinary administrator's office became aware of the case involving Baby Boy F. On November 27, 2019, the disciplinary administrator sent the respondent a letter, asking him to address specific questions regarding the Baby Boy F case:

15

'I would like you to explain the facts surrounding your decision in *Baby Boy F.* to allege in the adoption petition that the biological father "made no reasonable efforts to support or communicate with the Child after having knowledge of the birth of the Child" and that the biological father had "abandoned or neglected the Child after having knowledge of the Child's birth." If you did not have a factual basis for making these allegations at the time you filed the adoption petition, did you note in the adoption petition that your allegations would "likely have evidentiary support after a reasonable opportunity to further investigation or discovery?" See K.S.A. 60-211(b)(3).'

"57.    On December 5, 2019, the respondent provided a response, stating:

'Before this disciplinary action started, it was my practice to simply quote verbatim the provisions of K.S.A. 59-2136(h)(1) in my adoption petitions. Because Kansas is a notice pleading state, I included all applicable or potentially applicable provisions of the statute for termination of the birth father's parental rights in my initial pleading. Because a respondent/birth father is generally young and sometimes unsophisticated, I thought it fairest to inform the young man as soon as possible what was at stake. My intent was never to mislead the birth father or the court.

'Since the inception of the disciplinary claim, I have refined my pleading practice as you suggest in your letter. For example, in a recent petition filed after the child's birth I alleged that the birth father "has made or is expected to make no reasonable efforts to support or communicate with the Child after having knowledge of the Child's birth."'

"*Conclusions of Law*

"58.    The respondent stipulated that he violated KRPC 3.1 (meritorious claims and contentions), KRPC 3.3 (candor to the tribunal), and KRPC 8.4 (professional misconduct). Based on the above findings of fact and the respondent's stipulations, the

16

hearing panel concludes as a matter of law that the respondent violated KRPC 3.1 (meritorious claims and contentions), KRPC 3.3 (candor to the tribunal), and KRPC 8.4 (professional misconduct).

"KRPC 3.1

"59.    A lawyer may not 'bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous.' KRPC 3.1. The respondent stipulated that he violated KRPC 3.1. In this case, the respondent included issues in both of the adoption petitions without a factual basis for doing so. The respondent argued that he did so 'in an abundance of caution.' However, an attorney may not include allegations in a petition without factual support. As such, based on the respondent's stipulation and the evidence presented, the hearing panel concludes that the respondent violated KRPC 3.1. when he did not have a good faith basis for doing so.

"60.    The hearing panel is concerned that the respondent's current practice does not sufficiently correct the situation. The respondent indicated that in a recent adoption petition, he alleged that the birth father 'has made or is expected to make no reasonable efforts to support or communicate with the Child after having knowledge of the Child's birth.' The respondent must not make allegations in any petitions that lack a factual basis.

"KRPC 3.3(a)(1)

"61.    Rule 3.3(a)(1) provides that '[a] lawyer shall not knowingly make a false statement of material fact or law to a tribunal.' The respondent made false statements of material fact to the Court when he included allegations in the two adoptions petitions that were not true.

"62.    Specifically, in *In re Adoption of C.L.*, the respondent included the following allegations:

17

a. The identified biological father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the biological mother during the six months prior to the Child's birth;

b. The identified biological father abandoned the biological mother after having knowledge of the pregnancy;

c. The identified biological father has made no reasonable efforts to support or communicate with the Child after having knowledge of the birth of the Child;

d. The identified biological father abandoned or neglected the Child after having knowledge of the Child's birth;

e. The identified biological father is unfit; and

f. Termination of the parental rights of the identified biological father is in the best interests of the Child.

However, the alleged grounds for terminating the biological father's parental rights were made without prior factual investigation and were substantively false when filed, as the biological father only learned of the biological mother's pregnancy after C.L.'s birth and only four days before the respondent filed the petition seeking to terminate the biological father's parental rights. The respondent made false allegations in the adoption petition.

"63. In Baby Boy F.'s adoption petition, the respondent asserted that the biological father 'made no reasonable efforts to support or communicate with the child after having knowledge of the birth of the child' and had 'abandoned or neglected the child after having knowledge of the child's birth.' However, at the time the adoption petition was filed, the biological father did not know that Baby Boy F had been born. He learned of the birth of Baby Boy F when he was served with the adoption petition a few days later. Thus, the respondent made false allegations in the adoption petition.

18

"64.    Because the respondent provided false information to the Court, the hearing panel concludes that the respondent violated KRPC 3.3(a)(1).

"KRPC 8.4(c)

"65.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' Rule 8.4(c). As detailed above, the respondent engaged in conduct that involved dishonesty when he made false allegations in the two adoption petitions. As such, the hearing panel concludes that the respondent violated Rule 8.4(c).

"KRPC 8.4(d)

"66.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' Rule 8.4(d). This disciplinary case is based on two adoption cases where, as a result of the respondent's misconduct, two adoptions were overturned. In both of those cases, the respondent included allegations in the adoption petitions which were not supported by any facts in existence at the time of filing. As Judge Malone stated, the respondent:

        'alleged almost every legal ground for termination of parental rights set forth in the statute, without any evidence at the time to support the allegations, in the hope that something would stick by the time the case was heard in court.' [*C.L.*, 2018 WL 1022887, at *7 (Malone, J., concurring).]

As such, the hearing panel concludes that the respondent violated Rule 8.4(d).

"*American Bar Association
Standards for Imposing Lawyer Sanctions*

"67.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual

19

injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"68.     *Duty Violated*. The respondent violated his duty to his clients, the legal profession, and the legal system to maintain his personal integrity.

"69.     *Mental State*. The respondent negligently and knowingly violated his duty. The respondent's pattern of alleging the statutory grounds in adoption petitions without any factual support was careless, sloppy, and negligent. In addition, in these two particular cases, the respondent knew that some of the factors clearly did not apply.

"70.     *Injury*. As a result of the respondent's misconduct, the respondent caused serious injury to his clients, the birth mothers, the birth fathers, and the two children whose adoptions were overturned. The injury caused by the respondent cannot be remedied and will be long lasting.

"Aggravating and Mitigating Factors

"71.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.     *A Pattern of Misconduct*. Based on the respondent's written response and testimony, the respondent engaged in a pattern of misconduct throughout his career. It was his pattern and practice, in an 'abundance of caution,' to include all the statutory grounds in his petitions for adoptions regardless of the evidence involved in the case.

b.     *Vulnerability of Victim*. The respondent's clients, the biological mothers, the biological fathers, and children whose adoptions were set aside were vulnerable to the respondent's misconduct. By the nature of the cases in which the respondent's violations occurred, it is clear that these clients, as well as the necessary parties, are highly vulnerable. Given the respondent's many years of

20

experience in filing adoption pleadings, that vulnerability was well-known to the respondent.

c.      *Substantial Experience in the Practice of Law*. The Missouri Supreme Court admitted the respondent to the practice of law in Missouri in 1995 and the Kansas Supreme Court admitted the respondent to the practice of law in the State of Kansas in 1996. At the time of the misconduct, the respondent had been practicing law for approximately 20 years.

"72.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.      *Absence of a Prior Disciplinary Record*. The respondent has not previously been disciplined.

b.      *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent self-reported the misconduct. The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts and the rule violations.

c.      *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the adoption bar. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

d.      *Remorse*. At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct.

21

"73.     In addition to the above-cited factors, the hearing panel thoroughly examined and considered the following Standards:

'6.12     Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'6.13     Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

. . . .

'7.2     Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

'7.3     Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation of the Parties*

"74.     The disciplinary administrator recommended that the respondent's license to practice law be suspended for a period of 18 months. Counsel for the

22

respondent recommended that the respondent be censured and that the censure be published in the Kansas Reports."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the hearing panel, and the arguments of the parties and determines whether violations of the KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 226(a)(1)(A) (2021 Kan. S. Ct. R. 276). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint, to which he filed answers; he filed no exceptions to the hearing panel's final hearing report, but did enter into a joint stipulation agreement where he admitted to the facts as outlined in the agreement and to violating KRPC 3.1, 3.3, and 8.4. The finding of facts as set forth in the hearing panel's final hearing report are deemed admitted. Supreme Court Rule 228(g)(1), (2). The evidence before the hearing panel clearly established the charged misconduct violated KRPC 3.1 (meritorious claims and contentions); 3.3(a)(1) (making a false statement of fact or law to a tribunal); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

The final hearing report recommended we suspend respondent's license to practice law for a six-month period. Before us, the Disciplinary Administrator recommended an 18-month suspension. Neither the hearing panel nor the Disciplinary Administrator requested a Supreme Court Rule 232 reinstatement hearing to follow the suspension. See

23

2021 Kan. S. Ct. R. 287. Respondent requested the hearing panel's recommendation of a six-month suspension be followed.

These recommendations are just that—recommendations. See *In re Biscanin*, 305 Kan. 1212, 1229, 390 P.3d 886 (2017). The respondent's admitted pattern of conduct in these cases is egregious. He knowingly made false statements to a court with the intent to circumvent a father's constitutional rights to parent his own child and to obtain a fraudulent termination of that father's parental rights. In so doing, he "won" adoptions of the children for his clients which a significant time later had to be overturned due to the respondent's fraud.

In effect, respondent used the legal process to traffic children. It is not hyperbole to put the matter this starkly, and we can think of no breach of trust more significant or damaging than this. Our legal system depends on the highest standards of professionalism, integrity, truthfulness, and trustworthiness of our lawyers. Without this, we cannot be said to have a system of law, only a corrupt game of power and manipulation with a façade of lawfulness. A lawyer cannot come back from a breach of trust so grave. The confidence of the public and the sanctity of the rule of law can only be protected and preserved by meting out the most serious sanction available to us—disbarment.

Disbarment is the appropriate sanction when "a lawyer, with the intent to deceive the court, makes a false statement . . . and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." ABA Standards for Imposing Lawyer Sanctions, § 6.11 (1992). The harm respondent caused can hardly be understated—to his own clients (who were forced to suffer the heartbreaking judicial reversal of the adoptions of their children); to the fathers (who lost years of crucial parenting time with their children); to the children (who

24

doubtless will suffer early childhood trauma which may reverberate through their lives); and to the people of Kansas (whose confidence in our legal system's ability to arrive at just and equitable resolutions to such disputes is seriously undermined by such misconduct). In the past, we have dealt similarly with other cases of fraud and dishonesty. See *In re Nwakanma*, 306 Kan. 704, 397 P.3d 403 (2017); *In re Williams*, 302 Kan. 990, 362 P.3d 816 (2015). We hold that respondent is disbarred from the practice of law in the state of Kansas and enter judgment as follows.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Kevin W. Kenney be and he is hereby disbarred from the practice of law in the state of Kansas, effective the date of this opinion, in accordance with Supreme Court Rule 225(a)(1) (2021 Kan. S. Ct. R. 275) for violations of KRPC 3.1, 3.3(a)(1), 8.4(c), and 8.4(d).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 231 (2021 Kan. S. Ct. R. 286).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

STANDRIDGE, J., not participating.